G1QLMANC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MANORHAVEN CAPITAL LLC, f/k/a
BENGAL PARTNERS LLC,

                    Plaintiff,

             v.                        16 CV 0569 (PKC)

MATTHEW HEISSAN, et al.,

                    Defendants.

------------------------------x

                                       New York, N.Y.
                                       January 26, 2016
                                       3:08 p.m.

Before:

                    HON. P. KEVIN CASTEL,

                                       District Judge

                         APPEARANCES

GUSRAE KAPLAN NUSBAUM PLLC
      Attorneys for Plaintiff
BY:  MARTIN H. KAPLAN
      J. CHRISTOPHER ALBANESE

BRUCE ELSTEIN (By Telephone)
NICOLE BARBER (By Telephone)
      Attorneys for Defendants

ALSO PRESENT:  MATTHEW HEISSAN (By Telephone)

G1QLMANC

```
 1              (In the robing room)

 2              THE COURT:  Good afternoon.  This is Judge Castel.

 3    We're on the record in my robing room.

 4              And for the plaintiff I have?

 5              MR. KAPLAN:  Martin H. Kaplan, Gusrae Kaplan Nusbaum

 6    PLLC.  With me to my left is my associate Christopher Albanese.

 7              THE COURT:  Thank you both very much.

 8              And on the line, I take it, is Bruce Elstein and

 9    Matthew Heissan.  Is that correct?

10              MR. ELSTEIN:  That's correct.

11              MR. HEISSAN:  Matthew Heissan, yes.

12              THE COURT:  Thank you very much.

13              MR. ELSTEIN:  In addition, there's Nicole Barber, an

14    attorney at Goldman Gruder & Woods.

15              THE COURT:  Good afternoon to you as well.

16              MS. BARBER:  Good afternoon, your Honor.

17              THE COURT:  So I have the application for a temporary

18    restraining order and preliminary injunction, as well as an

19    affidavit in support, a memorandum.  I have the Marins

20    affidavit and also the Kaplan affidavit.  And the affidavit

21    lays out the scenario that on something on the order of seven

22    occasions after Stronghold ceased working for the plaintiff, it

23    accessed the electronic communication system of Manorhaven

24    Capital.  And certainly under 18 U.S.C. 2701, the intentional

25    access either without authorization or in excess of
```

G1QLMANC

1    authorization is a violation of the federal statute.

2              Do you deny, do you, Stronghold, deny, and you,

3    Mr. Heissan, deny that you accessed the system on seven

4    occasions after April 2015?

5              MS. BARBER:  Your Honor, this is Nicole Barber from

6    Goldman Gruder & Woods.  On behalf of all the defendants, we

7    don't want to take the risk of waiving this right, so I'd like

8    to make an oral motion to dismiss pursuant to 12(b)(3).  I

9    don't believe that this Court has venue to hear this matter at

10   this time.

11             THE COURT:  All right.  Well, tell me about it.  Why

12   is venue improper?

13             MS. BARBER:  Your Honor, it requires a substantial

14   amount of the alleged activity to have occurred in New York,

15   and a review of the complaint that has been filed would reveal

16   that none of the actions took place in New York.

17             THE COURT:  Well, I'm not sure that's what the venue

18   provision stands for in the case of a defendant corporation.

19   Now, it seems to me that venue may be proper where the party

20   may be found.  Is Stronghold found in this district?

21             MS. BARBER:  No, your Honor.

22             THE COURT:  Okay.  So let me hear the plaintiffs on

23   venue.

24             MR. KAPLAN:  The plaintiff Manorhaven has its office

25   in New York City and has had its office in Manhattan prior to

G1QLMANC

1  some of the invasions into the electronic communications by

2  Stronghold and Mr. Heissan.

3       THE COURT:  Well, that can't be correct because I just

4  had a lawyer represent to me that they're not present in this

5  district.  Isn't that correct, Ms. Barber?

6       MS. BARBER:  That's correct, your Honor.

7       THE COURT:  So it's untrue that you have an office in

8  this district.

9       MR. KAPLAN:  That's not what I meant, your Honor.  I

10  meant the plaintiffs have an office in this district where they

11  maintain their system and where the system was invaded in

12  Manorhaven was in New York when the system was invaded.  So

13  therefore venue --

14       THE COURT:  The system that was invaded was physically

15  situated in your New York office?

16       MR. KAPLAN:  That is correct, because there's a

17  connection from there to the Smarsh vendor.  And that's what

18  empowers it, the relationship between in this case Manorhaven,

19  formerly known as Bengal, and Smarsh.  Wherever Bengal or

20  Manorhaven is, where their computer system is, that's where it

21  exists.  And that was in Manhattan at 120 Wall Street and has

22  been that way since approximately May 1 of 2015.

23       THE COURT:  All right.  What do you say in response to

24  that?

25       MS. BARBER:  Your Honor, I can't speak to where a

G1QLMANC

1    cloud system is said to reside, but Smarsh Inc. is an Oregon

2    entity, and all of the actions alleged to have been taken by

3    all of the defendants occurred either in his New York office --

4    I'm sorry -- his Connecticut office or his Connecticut

5    residence, or in the case of Attorney Elstein, in a connected

6    courtroom.  Nothing here has occurred in New York, and arguably

7    Smarsh is located in Oregon.

8              THE COURT:  Let's see whether I can unpack all of

9    this.

10             These electronic communications, are they documents or

11   are they emails or both?

12             MR. KAPLAN:  They're both in electronic format.

13             THE COURT:  They're both emails and documents.

14             MR. KAPLAN:  Correct.  In electronic format, meaning

15   it's electronically stored.

16             THE COURT:  And where were they created?

17             MR. KAPLAN:  Some were created in New York, and some

18   were created elsewhere.

19             THE COURT:  And where are they stored?

20             MR. KAPLAN:  They're stored at Manorhaven where their

21   server is.  And there's a relationship from that server to

22   Smarsh, which essentially becomes the depository, the vendor

23   that allows for the retention in WORM form as required by the

24   regulations and allows for searching of that through the

25   Smarsh/Manorhaven connection.

G1QLMANC

| 1 | THE COURT:  So they are on your server and they are |
| 2 | also in a cloud type arrangement? |
| 3 | MR. KAPLAN:  I don't know if it's cloud.  It may be |
| 4 | hard.  But it's in a location under the control of Smarsh. |
| 5 | And, honestly, I don't know where Smarsh is specifically.  I |
| 6 | think they have offices all over the country. |
| 7 | THE COURT:  All right.  And maybe you want to tell me |
| 8 | on this venue motion, where did your client, if your client did |
| 9 | access this data, where was the data stored that it accessed? |
| 10 | MS. BARBER:  Your Honor, again, my understanding of |
| 11 | how these things are stored is that they're in a cloud type |
| 12 | facility. |
| 13 | THE COURT:  That's not what I asked you. |
| 14 | MS. BARBER:  And my client accessed them from |
| 15 | Connecticut. |
| 16 | THE COURT:  From Connecticut.  But what did he access, |
| 17 | do you know what he accessed? |
| 18 | MS. BARBER:  The cloud through his computer. |
| 19 | THE COURT:  He accessed the cloud through his |
| 20 | computer. |
| 21 | MS. BARBER:  Smarsh program, yes, who has a principal |
| 22 | place of business in Oregon, through his own personal computer |
| 23 | located in Connecticut. |
| 24 | THE COURT:  All right.  Okay.  And Manorhaven was in |
| 25 | privity of contract with is it Smarsh? |

G1QLMANC

1          MR. KAPLAN:  Smarsh.

2          THE COURT:  I conclude preliminarily at this stage

3     that Manorhaven has alleged that it controlled from New York

4     these electronic communications and their storage and, hence,

5     at this very preliminary stage, it appears that a substantial

6     part of the events giving rise to the claim occurred within

7     this district.  So without prejudice to your renewal on a more

8     fulsome record, I'm denying your venue motion.

9          MS. BARBER:  Thank you, your Honor.

10         THE COURT:  Okay.  So tell me what your clients did.

11         MS. BARBER:  Well, your Honor, before this motion, I

12    haven't spoken at any length with our clients.  And I'm not

13    sure that it's best to question him in this particular setting.

14         My understanding is that he was never told either

15    verbally or in writing that he could not access the program.

16    He helped create and set up the entire program.  In addition,

17    after he was terminated -- sorry.  Before he was terminated --

18    I'm sorry.  That's right.  It was an entity and they parted

19    ways and he helped them wind down and change their domain name

20    and he had access to do those kind of things.  There was never

21    any restriction put on him either verbally or in writing.  And,

22    in fact, he was asked to access the system to do certain things

23    like wind down and change the domain.

24         THE COURT:  Okay.  Let me hear from the plaintiff.

25         MR. KAPLAN:  Your Honor, in fact, what counsel has

G1QLMANC

1   told you is not accurate.  His access was limited only for

2   certain purposes, and he was not supposed to do general

3   searches.  In fact, he was only allowed access for ad hoc IT

4   matters.  And, in fact, Smarsh did not charge for his access,

5   because they usually charge by user, because he was not someone

6   who would be searching and doing the things that the Smarsh

7   system allows for.  It's only an IT connection.

8           And, certainly, under all circumstances, Judge,

9   there's a letter in April, the latter part of April, from

10  counsel for Mr. Heissan which says the relationship is over.

11  You owe us enormous amount of money for nine years and one

12  month of services at $2,000 a month and your demand is made to

13  pay.

14          Certainly, prior to that, at that date, everything was

15  ended.  Even if you were to argue that he had some type of

16  authorization at some point in time, thereafter, he invaded the

17  system on a number of occasions and took out hundreds of

18  electronic communications.  It's black and white proveable.

19  We've put as attachments to the exhibits the logs that Smarsh

20  maintains to show who searched, when they searched, and

21  somewhat what they took.

22          I'm sorry, Judge.  The logs are 2 inches thick.  We

23  didn't put them in.  We certainly have them.  And the

24  affidavits set forth -- I apologize, I misspoke, your Honor.

25  We originally intended to burden you with some more paper and

G1QLMANC

1    be ecological terrorists.  But the punch line was we didn't do

2    that.  But we have it, it's clear, and there's no question this

3    happened on events that are after April 23.

4            THE COURT:  April 23, 2015.

5            MR. KAPLAN:  Correct, your Honor.

6            THE COURT:  And that's when you maintain the

7    relationship ended.

8            MR. KAPLAN:  I maintain Mr. Heissan never had any

9    authority to do this.  But giving him the benefit of the doubt,

10   on April 23 there can be no question that from that date

11   forward, it was black and white to everyone, including

12   Mr. Heissan, that his relationship with Manorhaven/Bengal had

13   ended.

14           THE COURT:  All right.  Let me hear from the

15   defendant.

16           MR. KAPLAN:  Your Honor, if I just may one moment.  I

17   apologize.  There's a third affidavit you didn't mention when

18   you began the record.  It's an affidavit from Mr. John Keating.

19   Mr. Keating is the former CEO of Bengal and he was the CEO

20   through the time that Mr. Marins became the managing member and

21   he put in an affidavit.  I have another copy if you need it,

22   Judge.

23           MR. ALBANESE:  It should be one of the last documents,

24   your Honor, in the package.

25           THE COURT:  I have it now.  Thank you.

G1QLMANC

1          MR. KAPLAN:  And as is evident from that, it clearly

2     recites that Mr. Heissan never had full authority to use the

3     system and further recites the details relating to the services

4     performed.  And, for the record, I firmly disagree with

5     counsel's description of what he did in connection with Smarsh,

6     he being Mr. Heissan and Stronghold, did in connection with

7     Smarsh.  Accordingly, I think giving every benefit of the doubt

8     to the defendants, from April 23 on, every one of those

9     invasions of the platform and the taking of electronic

10    communications violated 18 U.S.C. 2707.

11         THE COURT:  All right.  Let me take it for the period

12    prior to April 23, and I realize that that stands on a

13    different footing.  What was the nature of the authorization

14    that the defendants had prior to April 23, for what purposes

15    were they authorized to access the system?

16         MR. KAPLAN:  The system -- Stronghold was authorized

17    to go into the system because periodically there are

18    technological glitches -- I'm not sufficiently sophisticated in

19    computers to describe exactly what they are -- and they need to

20    be remedied, like a mechanic fixing an engine, and that's what

21    he was authorized to do.  But I think it's incredibly

22    significant, Judge, that for 500 days prior to the April

23    invasions of the system, there was no entry by Mr. Heissan into

24    the system 500 days prior to that.  So it demonstrates clearly,

25    certainly --

G1QLMANC

1              THE COURT:  Why do you pick 500 days?  What is the

2     significance of 500 days?

3              MR. KAPLAN:  That's as far back as we counted.  That's

4     how far back the system goes.  The system doesn't go beyond 500

5     days.  Maybe it's 2,000 or 3,000 days; I don't know.  That

6     doesn't mean, honestly, your Honor, that we won't be able get

7     that information ultimately, but you can't get it just by going

8     into the system and requesting information.

9              THE COURT:  All right.  Does the defendant claim

10    lawful ownership of the downloaded documents?

11             MS. BARBER:  Your Honor, I think that's a different

12    question than lawful access.

13             THE COURT:  Why don't you answer my question.

14             MS. BARBER:  I think he rightfully has possession of

15    them.  He had access.  He had permissible access to the system.

16    He had carte blanche access to the system.  He created it.

17             THE COURT:  There's no dispute here he had access to

18    the system.  That's why we're having this conversation in this

19    proceeding this afternoon.  That's beyond dispute here.  He had

20    access to the system.  No one is contesting that.

21             MS. BARBER:  And it was authorized, your Honor.  There

22    were never any restrictions put on his access.

23             THE COURT:  All right.  And you maintain that, for

24    example, today, he has the lawful right to go into the system

25    and download any documents he chooses today.  Correct?

G1QLMANC

1          MS. BARBER:  Your Honor, arguably this particular

2     complaint would be notice to him that the plaintiff no longer

3     gives him authorized access.  But until this was received by

4     him this afternoon, approximately an hour or an hour and a half

5     ago, yes.

6          THE COURT:  Okay.  So up until an hour and a half ago,

7     he had the lawful right to go into the Manorhaven system and

8     download at will any document he chose to.  That's your

9     position, correct?

10          MS. BARBER:  He had been authorized to do so and there

11     had never been a restriction on his access.

12          THE COURT:  All right.

13          MS. BARBER:  They actually asked him to access the

14     system on particular occasions, which he can attest to if we

15     are permitted time to respond.

16          THE COURT:  You want to give me the last date of such

17     a circumstance?

18          MR. ELSTEIN:  I don't know the exact date, your Honor.

19     It was when they requested that he assist in the transfer of

20     the domain from Bengal Partners to Manorhaven.  It was a name

21     change.

22          THE COURT:  Give me an idea.  Was it last week?

23          MR. ELSTEIN:  No.

24          THE COURT:  Was it last month?

25          MR. ELSTEIN:  Maybe our client can give us an idea.

G1QLMANC

```
1            THE COURT:  Was it two months ago?

2            MR. ELSTEIN:  Matthew, can you chime in when it

3    approximately was?

4            MR. HEISSAN:  Approximately two three.  The profile

5    update for the domain registration was approximately two three

6    of 2015.

7            THE COURT:  What does two three of 2015 mean,

8    February 3?

9            MR. HEISSAN:  I apologize.  Quarter three.  Sometime

10   in the third quarter of 2015.  I apologize.

11           THE COURT:  Are they on a calendar fiscal year or are

12   they on a non-calendar fiscal year, Mr. Heissan?

13           MR. HEISSAN:  Sometime in July, August, or September

14   of 2015, that email.  I just don't have it in front of me, your

15   Honor.  I apologize.

16           THE COURT:  And you don't have a recollection.

17           MR. HEISSAN:  It's one of those three months.  I just

18   know Zachery Marin emailed me from Manorhaven.

19           THE COURT:  Mr. Heissan, what's the nature of your

20   business?

21           MR. HEISSAN:  I do IT consulting and support.

22           THE COURT:  And what kind of work did you do for

23   Manorhaven?

24           MR. HEISSAN:  I believe Manorhaven is Bengal Partners.

25   In back in May of 2015, Smarsh sent me an email about the
```

G1QLMANC

1   merger with Manorhaven.  Given I am one of their main contacts

2   for the company --

3         THE COURT:  We're not understanding you.  You have to

4   speak clearly.  We did not hear what you just said.

5         MR. HEISSAN:  I apologize.  Smarsh, back in 5/19/2015,

6   so after that April 23 date that the gentleman sitting with

7   you, Mr. Kaplan, stated, I have an email from Smarsh saying

8   that I am listed as an authorized user for Bengal Partners and

9   they talk about the merger with Manorhaven and that I'm

10  continued to have access to it.  I never once was told by --

11  and Zachery Marins from Manorhaven emailed me a number of times

12  many months past that as well, and no one ever once told me I

13  never had access to -- that I shouldn't have access to those

14  parts.

15        THE COURT:  This case is not about access.  It's about

16  authorization.  There's no question here that prior, well,

17  right up to the moment the defendants have access.  There's no

18  dispute about that.  They may have access right now.

19        MR. KAPLAN:  They don't.  It's been cut off, Judge.

20        THE COURT:  But up until very recently -- when was it

21  cut off?

22        MR. KAPLAN:  About a week ago.

23        THE COURT:  Okay.  They had access.  The question is

24  whether they had authorization.  That's the question.

25        MR. HEISSAN:  Smarsh states in an email, and I can

G1QLMANC

1    forward it to you, says I have you, meaning me, listed as an

2    authorized user for Bengal Partners.  It talks about the merger

3    with Manorhaven Partners.  That's past the April 23 or 5th date

4    that Mr. Kaplan mentioned.

5            THE COURT:  All right.  Who can tell me generically

6    the nature of the documents that were downloaded from the

7    Manorhaven system.

8            MR. KAPLAN:  Well.

9            THE COURT:  Your colleague is eagerly.

10           MR. KAPLAN:  He knows better than I do.

11           MR. ALBANESE:  I was the one who manually did the

12   search, your Honor, and I reviewed some of the activity of

13   Mr. Heissan, all of the activity of Mr. Heissan after April 20.

14   I did, just so you know, I did a search of Mr. Heissan's email

15   address within the system, and there were less than a thousand

16   emails related directly to and from Mr. Heissan going back

17   years.

18           Mr. Heissan downloaded over 50,000 emails containing

19   documents above and well beyond anything that Mr. Heissan sent

20   or received, including attorney-client privileged information

21   and client information that's protected on regulation SP.

22           THE COURT:  What do you mean by client information?

23   Be more specific.

24           MR. ALBANESE:  Bengal Partners is a broker dealer.  It

25   has public clients in the financial industry, and they trade

G1QLMANC

1    basically for those clients.  Under regulation SP, the client

2    information is sacrosanct.  It's protected by the firm.

3              THE COURT:  And how do you know it was downloaded by

4    the defendants?

5              MR. ALBANESE:  The logs from Smarsh tell us so.

6              THE COURT:  And information on approximately how many

7    customers?

8              MR. ALBANESE:  I have not done a direct analysis of --

9              THE COURT:  Was it one?

10             MR. ALBANESE:  No, it was many because I don't -- I

11   have not been able to do an analysis of each of the 50,000

12   emails because there were so many.

13             THE COURT:  All right.

14             MR. ALBANESE:  Now, just in furtherance of that, in

15   follow up to what Mr. Kaplan had said, there was no activity,

16   Mr. Heissan has never downloaded emails for himself.  He never

17   reviewed emails.  That was not part of his -- and that's what

18   Mr. Keating's affidavit goes to say.  This is well above and

19   beyond anything that he was authorized to do during his work

20   with Bengal Partners.

21             THE COURT:  Okay.  All right.  Anything else the

22   defendants wish to say?

23             MR. HEISSAN:  Your Honor, I downloaded emails all the

24   time from all of the users.  Just so you know, I paid for the

25   domain and the hostings.  You cannot have emails without the

G1QLMANC

1   hosting and the domain registration and I paid for that for at

2   least seven to nine years myself and was never reimbursed for

3   that.  I'm the one who created the emails.  I downloaded emails

4   constantly.  Servers, the emails I have access to in storage

5   because I do work for Bengal Partners, now Manorhaven

6   Partners -- and he was supposed to get back in contact with me

7   and has yet to do so.  So I still have work for Bengal Partners

8   or Manorhaven.

9            THE COURT:  Okay.

10            MR. ALBANESE:  Your Honor.

11            MR. ELSTEIN:  Your Honor, I have something to add.

12            THE COURT:  Go ahead.

13            MR. ELSTEIN:  Bruce Elstein.  We heard Mr. Albanese

14   talk about emails to the system.  But with all due respect,

15   it's access to records that are maintained by Smarsh.  And the

16   importance of it is, as I understand it, that we can discern

17   what was search results versus what was downloaded.  And

18   without knowing that information, I don't think Mr. Albanese

19   has the qualification to distinguish between those two.  If a

20   search was made and results were indicated, I think he's

21   counting all of those as a download, when in fact if we would

22   have direct proof of Smarsh, I think that would prove exactly

23   to the contrary.

24            THE COURT:  All right.

25            MR. ALBANESE:  Your Honor, he's a hundred percent

G1QLMANC

1    wrong on that.  There are logs that explicitly state both the

2    searches on one hand and the downloads on the other and we do

3    have hard proof from Smarsh of each instance, excuse me, 35

4    instances of downloads by Mr. Heissan that total over 50,000

5    emails, separate and distinctive from the searches and each --

6    if you want to talk point of access that Mr. Heissan did, there

7    were over 8,000 points of access.

8            THE COURT:  I don't know what that means.

9            MR. ALBANESE:  That means every time Mr. Heissan did a

10   key stroke or did a search on a function within the system, it

11   recorded it.  And there were over 8,000 instances where

12   Mr. Heissan utilized the Smarsh system.

13           MR. KAPLAN:  If I may, your Honor, that's sort of like

14   a refined search as you go through on Westlaw and you start

15   narrowing your principles of law, it's the same thing here as

16   you go in and give different commands to narrow and identify

17   additional documents from your earlier search.

18           THE COURT:  Anything else from the defendant?

19           MS. BARBER:  No, your Honor.

20           MR. HEISSAN:  Just that I had done downloads for John

21   Keating in April and accessed all of his emails and I

22   downloaded them and distributed them for him.  He knows that I

23   do this.  He knows I'm the one that creates all the email

24   addresses and gives them to users.  I'm the one who has

25   complete access to all of them.  I have more access than John

G1QLMANC

1    Keating, the president and CEO, for all of the nine and a half

2    years for all this data.  I had unrestricted access.

3              THE COURT:  Okay.  Thank you.

4              All right.  That appears to conclude everything that I

5    need.  I'm now prepared to rule.

6              Under 18 U.S.C. Section 2701, it is a crime to either,

7    one, intentionally access without authorization a facility

8    through which an electronic communication service is provided,

9    or intentionally exceed an authorization to access that

10   facility where the person thereby obtains, alters, or prevents

11   authorized access to a wire or electronic communication while

12   it is in a storage in such system.

13             18 U.S.C. 2707 provides for a civil action that may be

14   brought, including for, under subdivision B, for preliminary

15   and other equitable relief as appropriate.

16             Here it is acknowledged by both sides that up until

17   very recently, the defendants, and specifically Matthew

18   Heissan, had access to a facility which stored electronic

19   communications of Manorhaven.  That is not the issue in this

20   proceeding, whether he had access.  We wouldn't be here if he

21   didn't have access.  He indeed did.  The question is whether he

22   either intentionally accessed without authorization or he

23   intentionally exceeded an authorization to access the facility.

24             Here at the temporary restraining order phase, the

25   plaintiff has demonstrated that Mr. Heissan and Stronghold

G1QLMANC

1    Media were engaged for the purposes of rendering IT services.

2    The services that were to be performed included repairing and

3    upgrading and facilitating the electronic data system utilized

4    by Manorhaven.  It included, according to Mr. Heissan, the

5    creation of email accounts and addresses.  And Mr. Heissan

6    readily acknowledges and there is no dispute that, at least at

7    the TRO stage, that he was responsible for creating the system

8    or at least upgrading it and maintaining parts of it in his

9    capacity as an IT vendor.

10           That, however, is not authorization to download

11   business information of the plaintiff.  The representation that

12   has been made before me and which has gone unchallenged is that

13   customer information of the plaintiffs, a broker dealer, was

14   downloaded by the defendants.  And such downloading for a

15   purpose unrelated to the maintenance or IT services rendered is

16   the exceeding of authorization.

17           I find that without a temporary restraining order, the

18   plaintiff and the plaintiff's customers are likely to suffer

19   irreparable injury.  The probability of success on the merits

20   has been demonstrated.  Money damages are not an adequate

21   remedy for the danger of further dissemination of information

22   from this facility.  And, accordingly, I'm granting the TRO in

23   full.

24           And I'm requiring that a bond in the amount of $5,000

25   be posted by February 2 at 5 o'clock in the afternoon.  And

G1QLMANC

1    that service of this order be by tomorrow and then it can be by

2    electronic service.

3              I'm setting the date for the preliminary injunction

4    hearing for February 3 at 11 a.m.

5              And I'm marking this order as entered as of 3:44 p.m.

6              Thank you all very much.

7              MR. ELSTEIN:  Your Honor, I have one point of

8    clarification.

9              THE COURT:  Yes, sir.

10             MR. ELSTEIN:  Are you signing the order that was the

11   draft of which was provided to us unsigned, is that the order

12   that you're signing?

13             THE COURT:  It is except it's been modified to include

14   information about the date and time of the preliminary

15   injunction hearing, the date for posting a bond, the amount of

16   the bond, and the time of service of this order.

17             MR. ELSTEIN:  May I just ask for one point of

18   clarification.  In the second ordered paragraph --

19             THE COURT:  Yes.

20             MR. ELSTEIN:  -- the unrestricted with date, and we

21   talked about dates here being before and after from a date.  I

22   didn't hear your Honor clarify that point at all.

23             THE COURT:  I don't know what you mean by clarify that

24   point.  There is no date restriction in my order.

25             MR. ELSTEIN:  Right.  But we talked about there being

G1QLMANC

1   a difference and I think the papers talked about there being a

2   difference before April 23, arguably, and after.  Is the order

3   silent in that regard?

4           THE COURT:  The order is most emphatically silent

5   because the basis of my ruling is that even if every one of the

6   documents were downloaded and could be proven to have been

7   downloaded in March of 2015, it would violate the statute

8   because I found preliminarily at the temporary restraining

9   order that it's in excess of the defendants' authorization.

10          Anything further from the plaintiff?

11          MR. KAPLAN:  No, your Honor.

12          THE COURT:  Anything further from the defendant?

13          MR. ELSTEIN:  No, your Honor.

14          THE COURT:  Thank you very much.

15                           o0o

16

17

18

19

20

21

22

23

24

25